IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | | |
|---|---|---|
| Brook Waddle, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 7:06-1960-HMH |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| Maskin Management Corp. and | ) | |
| National Union Fire Ins. Company | ) | |
| of Pittsburgh, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on Maskin Management Corporation ("Maskin") and National Union Fire Insurance Company of Pittsburgh's ("National Union") (collectively "Defendants") motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. After review, the court grants the Defendants' motion for summary judgment.

## I. FACTUAL BACKGROUND

The facts in this case are largely undisputed. National Union issued a blanket accident insurance policy ("Policy") effective from August 1, 2005, through August 1, 2006, to the South Carolina High School League. (Def.'s Mem. Supp. Summ. J. Mot. 2.) Maskin serves as the claims administrator of certain claims under the Policy. (Id.)

Brook Waddle was a varsity cheerleader at Landrum High School ("LHS") in Landrum, South Carolina in September 2005. (Id. 4.) On September 2, 2005, Waddle was scheduled to cheer at a football game at Blue Ridge High School in Greer, South Carolina. Pursuant to LHS's policy, a bus was scheduled to transport the cheerleaders and their coach, Christina Neighbors ("Neighbors"), from LHS to the game at Blue Ridge High School. (Id.) On the afternoon of September 2, the cheerleaders were free to leave school premises so long as they

returned at a designated time to board the bus.  (Pl.'s Mem. Opp'n Summ. J. 1.)

At some point after school was dismissed on the afternoon of September 2, 2005, and prior to returning to LHS to board the bus to travel to the football game, Waddle and two other cheerleaders, Angela Dodson ("Dodson") and Melissa Pitts ("Pitts") (collectively "cheerleaders"), were involved in an automobile accident.  (Def.'s Mem. Supp. Summ. J. 4.)  At the time of the accident, Waddle was a passenger in the car, which was operated by Dodson and owned by Dodson's grandmother.  (Id. 4-5.)

Pitts and Dodson both testified that after school was dismissed, the three cheerleaders drove to a hair salon in Boiling Springs, South Carolina, where they had their hair done.  (Id. 5.)  Waddle alleges that at the time of the accident, the three cheerleaders were driving from the hair salon to Dodson's house.  (Pl.'s Mem. Opp'n Summ. J. 1.)  The cheerleaders planned to pick up Dodson's cheerleading uniform from her home and then drive to LHS to meet the bus.  (Id.)  It is undisputed that no adult accompanied the cheerleaders in the automobile at any point during the afternoon.  (Id.)

Waddle suffered fractures of her C-5 and C-6 vertebrae as a result of the accident. (Def.'s Mem. Supp. Summ. J. 6.)  LHS submitted a claim for insurance benefits under the Policy on Waddle's behalf.  (Id.)  National Union denied the claim on the basis that Waddle was not participating in an activity covered under the Policy at the time of the accident.  (Id.)

## II. Discussion of the Law

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248.  Moreover, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

### B.  Covered Activity

The Defendants argue that Waddle is not entitled to benefits under the Policy because she was not engaged in a "Covered Activity" at the time of the accident.  (Def.'s Mem. Supp. Summ. J. Mot. 7.)  The Policy "provides accident insurance to Insureds while they are participating in Covered Activities."  (Id. Ex. 6 (Eileen M. Duffy ("Duffy") Aff. Ex. A (Policy 1)).)  Covered Activities are defined as follows:

> **Sports:** While participating during the official season of the sport as a member of an interscholastic athletic team, including interscholastic football, band members, cheerleaders, majorettes, participants of intramural sports, gym, classes, coaches, managers, trainers and non-sport extracurricular activities of the Participating

3

> Organization. Participation must be in a regularly scheduled and approved practice session or game of the Participating Organization and under the supervision of proper adult authority of the Participating Organization. This includes coverage for travel directly and uninterruptedly to or from the above with other members of the team in a vehicle designated by the Participating Organization and under the direct supervision of the proper adult authority of the Participating Organization.

(Id. Ex. 6 (Duffy Aff. Ex. A (Policy 13)).) Thus, the applicable provision requires that to be covered under the Policy, the student must be:

   (1)   traveling "directly and uninterruptedly to or from" the event;
   (2)   "with other members of the team;"
   (3)   "in a vehicle designated by the Participating Organization;" and
   (4)   "under the direct supervision of the proper adult authority of the Participating Organization."

(Id. Ex. 6 (Duffy Aff. Ex. A (Policy 13)).)

The Defendants do not dispute that Waddle was traveling with other members of the team at the time of the accident. However, the Defendants assert that Waddle presents no evidence satisfying the remaining three conditions. The Defendants argue that "the facts of the case, taken in the light most favorable to her, show that Plaintiff was *not* traveling directly and uninterruptedly to a regularly scheduled game; was *not* traveling in a school-designated vehicle; and was *not* under the direct supervision of proper adult authority from the high school." (Id. 9.) Thus, the Defendants argue they are entitled to summary judgment.

Waddle has the burden of showing that her injuries were covered by the terms of the Policy. See Garrett v. Pilot Life Ins. Co., 128 S.E.2d 171, 173 (S.C. 1962). "The construction of a written contract presents a question of law for the Court only when the contract is clear, unambiguous and free from doubt." Id. at 174. "[I]n cases where there

4

is no ambiguity, contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood in their plain, ordinary, and popular sense." Id. "Where there is ambiguity, uncertainty or doubt as to proper construction of the contract, intention of the parties becomes a question of fact for the jury to determine . . . ." Id.

**1. Direct and Uninterrupted Travel**

The parties agree that Covered Activities under the Policy includes "travel directly and uninterruptedly to or from" "a regularly scheduled and approved practice session or game of the Participating Organization." (Def.'s Mem. Supp. Summ. J. Ex. 6 (Duffy Aff. Ex. A (Policy 13)).) In addition, the parties do not dispute that the football game at Blue Ridge High School was a "regularly scheduled and approved . . . game of the Participating Organization." Further, it is undisputed that at the time of the accident, the cheerleaders were traveling to Dodson's house to pick up her cheerleading uniform before traveling to LHS to meet the bus. (Pl.'s Mem. Opp'n Summ. J. 1; Def.'s Mem. Supp. Summ. J. 10.)

The Defendants argue that the Policy does not provide coverage for Waddle's injuries because the accident did not occur while the cheerleaders were traveling directly and uninterruptedly to or from the football game at Blue Ridge High School. (Def.'s Mem. Supp. Summ. J. 10.) Waddle argues that because the cheerleaders were driving to Dodson's house in order to pick up her cheerleading uniform, which she was required to wear to the football game, the cheerleaders were traveling with the purpose of attending the game. (Pl.'s Mem. Opp'n Summ. J. 2-4). Thus, Waddle argues, the cheerleaders

5

were traveling directly and uninterruptedly to the football game at Blue Ridge High School. (Id.)

The court finds that the contract provision requiring direct and uninterrupted travel to an authorized school event is unambiguous. See Garrett, 128 S.E.2d at 174-75 (finding an insurance policy provision covering travel directly between home and school to be unambiguous). The Policy only covers injuries sustained during direct and uninterrupted travel to an authorized event.

Further, the court finds that the undisputed facts of this case show that Waddle was not injured while traveling directly and uninterruptedly to the football game at Blue Ridge High School. At the time of the accident, Waddle had not yet commenced travel to the football game. As the Defendants point out, the cheerleaders had two additional stops to make, one at Dodson's house and one at LHS, before commencing travel to the football game on the bus designated by LHS. (Def.'s Mem. Supp. Summ. J. 12.) Therefore, the cases cited by Waddle, which generally hold that a slight diversion does not preclude a finding of direct travel, are inapplicable to the instant facts, which indicate that Waddle had not yet commenced travel to the football game at Blue Ridge High School at the time of the accident. (Pl.'s Mem. Opp'n Summ. J. 3-4.)

**2. Designated Vehicle**

Second, the Defendants contend that Waddle was not traveling in a "vehicle designated by the Participating Organization" at the time of the accident. The parties do not dispute that Waddle was a passenger in a private vehicle operated by Dodson and owned by Dodson's grandmother at the time of the accident. (Def.'s Mem. Supp.

Summ. J. 4-5; Pl.'s Mem. Opp'n Summ. J. 1.) However, Waddle argues that Dodson's vehicle was a "designated vehicle" because LHS required the cheerleaders to report to the school to meet the bus and did not provide transportation to do so. (Pl.'s Mem. Opp'n Summ. J. 5.)

In support of her argument that LHS designated Dodson's vehicle, Waddle cites Odessa School Dist. No. 105 v. Insurance Co. of America, 791 P.2d 237 (Wash. Ct. App. 1990). In that case, the Washington Court of Appeals found that a similarly-worded policy provided coverage for a student's injuries sustained in an automobile accident. In Odessa, a high school track team met in the school parking lot following practice to attend a party to celebrate the end of the track season. Id. at 238. The team drove in private cars to the venue where the party was to be held. Id. The injured student was a passenger in a van owned by the head track coach and driven by the assistant track coach. Id. En route to the party, the van was involved in an accident, and the student suffered serious injuries as a result. Id. Based on these facts, the court found that the van was designated as "school transportation" because the "coach had the power to designate his private van as 'school transportation'; the team was traveling under his direction; and Mrs. Read, an assistant coach, was driving the van." Odessa, 791 P.2d at 241-42.

The facts of Odessa are distinguishable from the instant case. In Odessa, the coach, as a school representative, took affirmative actions to designate his van as school transportation. Pursuant to his direction, the entire team met as a group at the school and was traveling directly to the authorized school event when the accident occurred.

Id. at 238, 241. In addition, the coach provided his own vehicle, which was driven by an assistant coach, and the coach was present at the time of the accident. Id. at 241-242.

In the case at bar, Neighbors merely instructed the cheerleaders to arrive at LHS at a designated time to meet the bus. The fact that the school did not furnish transportation to the school for the cheerleaders who chose to leave school grounds after school does not lead to the conclusion that every vehicle the cheerleaders used to return to LHS was a "vehicle designated by the Participating Organization." The only vehicle LHS authorized and designated for travel to the football game at Blue Ridge High School was the bus waiting at the school. (Def.'s Mem. Supp. Summ. J. Ex. 3 (Susan S. Vasquez Depo. 9-10, 27).) Based on the foregoing, the vehicle driven by Dodson at the time of the accident was not a "vehicle designated by the Participating Organization." Therefore, the Policy does not provide coverage for Waddle's injuries.

## 3. Under Supervision

Third, the Defendants contend that Waddle was not "under the direct supervision of the proper adult authority of the Participating Organization" at the time of the accident. (Id.14.) It is undisputed that no adults were in the car with the cheerleaders at the time of the accident. (Id. 14; Pl.'s Mem. Opp'n Summ. J. 1.) Thus, the Defendants argue that the cheerleaders were not "under the direct supervision of the proper adult authority of the Participating Organization" when the accident occurred. (Def.'s Mem. Supp. Summ. J. 15-16.)

Waddle argues that the language of the Policy does not require the physical presence of an adult authority. Waddle contends that Neighbors' instructions to the

8

cheerleaders regarding "when and where they had to be" constituted direct supervision. (Pl.'s Mem. Opp'n Summ. J. 9.) In addition, Waddle points to Dodson's testimony during her deposition that "she considered herself to be supervised by her coach at all times" because "the cheerleaders were affirmatively expected to be role models, all the time, whether in the presence of the coach or not, and that if they were not, and it was reported to the coach they could be disciplined." Id. 9.)

In support of her argument, Waddle cites Continental Cas. Co. v. Borthwick, 177 So. 2d 687 (Fl. Dist. Ct. App. 1965). In Continental, the policy in issue covered accidents occurring "under supervision of proper authority of the school." Id. at 688. The injured student was a member of a high school swim team. The high school had no swimming pool or means of transporting the team to a private pool. Id. Accordingly, the school's swimming coach organized a car pool for the purpose of transporting the swim team members to the swimming pool.

> On the day before such meets, the coach reminded the girls of their responsibility to furnish transportation, urging them to make arrangements as to which car each would ride in, and to go directly to the pool. He did not allow them to stop at any place along the way to the pool except at the homes of certain girls who lived near the school and had obtained his permission to stop at their homes in order to pick up their swimming suits or other articles on the way to the pool.

Id. In addition, the coach advised the drivers to "take the less-traveled streets to the said pool." Id.

With the consent of the coach and pursuant to the car-pool plan, one of the swim team members was driving her father's car directly to the private pool when she collided with another car and suffered injuries. Continental Cas. Co., 177 So. 2d at 688. Based on the facts above, the District Court of Appeals of Florida held that the term

9

"supervision" was ambiguous, and "that the evidence adduced at trial was legally sufficient to support the conclusion of the jury . . . that [the injured student] at the time of her injury was in a group that was 'under supervision of proper authority of the school.'" Id. at 690.

The facts of Continental are distinguishable from those of the instant case. First, the Continental court expressly noted in its opinion that the insurance company "must be presumed to have deliberately elected to include [in the policy] the general, vague, and comprehensive word 'supervision' without using any qualifying adjectives or phrases that would limit the scope of the word with such adjectives as 'personal,' 'immediate,' or 'direct.'" Id. at 689-90. In contrast, the Policy at issue in this case limited coverage to injuries sustained under the "direct supervision of a proper adult authority." (Def.'s Mem. Supp. Summ. J. Ex. 6 (Duffy Aff. Ex. A (Policy 13) (emphasis added)).) Further, the degree of supervision exerted by the coach in Continental far exceeded merely instructing the members of the team to meet at a certain place and time. In addition, the coach specifically orchestrated in great detail the means of travel for the team members. No such actions were taken by Neighbors.

The other cases cited by Waddle similarly found the existence of supervision based on facts indicating a greater right to and exercise of supervision than Neighbors exercised over the cheerleaders at the time of their accident. See Crawford v. Mid-America Ins. Co., 488 S.W.2d 255, 259-60 (Mo. Ct. App. 1972) (finding supervision over a parking lot on school grounds during a football game when the principal was present at the game, circulating around the property, and had the right to eject spectators

from the property); Lumbermens Mut. Cas. Co. v. Broadus, 115 So.2d 130, 133 (Miss. Sup. Ct. 1959) (affirming circuit court's finding that a swimming pool on school grounds was under the supervision of a proper school authority, the swimming pool manager).

A review of case law reveals no analogous cases supporting Waddle's position that Neighbors' instruction to the cheerleaders that they return to the school at a certain time constituted direct supervision over the cheerleaders from the time school was dismissed until the cheerleaders returned. In fact, other cases indicate that school insurance policies requiring supervision by a school authority do not provide coverage for students traveling to or from events in the absence of additional facts demonstrating supervision by a school authority. See Charles v. American Progressive Health Ins. Co., 127 So. 2d 459, 460 (Fla. Dist. Ct. App. 1961); Sovereign Life Ins. Co. v. Busse, 401 S.W.2d 926, 928 (Tex. Ct. App. 1966).

Dodson's assertion that the cheerleaders "were really supervised by their coach all the time" because they were expected to be role models does not support a finding that the cheerleaders were directly supervised by Neighbors at the time of the accident. (Pl.'s Mem. Opp'n Summ. J. 9.) During Dodson's deposition, she testified that she did not consider herself to be under the supervision of someone from the school at any point after she left school on the afternoon of September 2, 2005. (Def.'s Mem. Supp. Summ. J. Ex. 1 (Dodson Depo. 29-30).) In addition, it is undisputed that Neighbors did not instruct the cheerleaders in any way regarding their activities on the afternoon of the accident except to require them to be at the high school at a certain time to meet the bus.

Neighbors testified in her deposition that the cheerleaders were not under her supervision at the time of the accident and that she had no personal knowledge as to where the cheerleaders were traveling at the time of the accident. (Id. Ex. 4 (Neighbors Depo. 14, 16.)

The undisputed facts indicate that the cheerleaders were not under the direct supervision of Neighbors or other appropriate adult authority at the time of the accident. Therefore, under the unambiguous terms of the Policy, no coverage exists under the Policy for Waddle's injuries. Based on the foregoing, the Defendants' motion for summary judgment is granted.

Therefore, it is

**ORDERED** that the Defendants' motion for summary judgment, docket no. 20, is granted.

**IT IS SO ORDERED.**

                                                               s/Henry M. Herlong, Jr.
                                                                United States District Judge

Greenville, SC
February 26, 2007